THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JON FLOWERS, | CASE NO. C17-0989-JCC |
| Plaintiff, | ORDER |
| v. | |
| FRED HUTCHINSON CANCER RESEARCH CENTER, | |
| Defendant. | |

This matter comes before the Court on Defendant's motion for summary judgment (Dkt. No. 52) and Plaintiff's motion to compel (Dkt. No. 60). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby DENIES Defendant's motion for summary judgment and GRANTS in part and DENIES in part Plaintiff's motion to compel (Dkt. No. 60) for the reasons explained herein.

## I. BACKGROUND

Plaintiff Jon Flowers ("Flowers") began working for Defendant Fred Hutchinson Cancer Research Center ("Fred Hutch") in 2001. (Dkt. No. 56 at 1.) Flowers was initially hired as an Employee Relations Specialist in the Human Resources ("HR") Department, but was eventually given the title of Employee Relations Supervisor. (*Id.* at 2.) In that role, Flowers briefly supervised another employee in 2004, but thereafter never supervised anyone else again. (*Id.*;

Dkt. No. 54 at 2.)

From his hire until 2012, Flowers was supervised by Kim Williams ("Williams"). (Dkt. No. 54 at 1–2.) While Williams liked Flowers personally, she became increasingly disappointed with his work performance. (*Id.* at 2.) Around 2011, Williams recommended to Fred Hutch's Vice President of HR, Han Nachtrieb ("Nachtrieb") that Flowers be terminated because of his poor performance.[1] (*Id.* at 3.) Nachtrieb did not follow Williams' recommendation because he liked Flowers and wanted him to succeed. (Dkt. No. 56 at 2.) Instead, Nachtrieb tried to find other opportunities for Flowers to succeed at Fred Hutch. (*Id.*)

Not long after Williams left Fred Hutch in 2012, Nachtrieb oversaw the reorganization of the HR Department. (*Id.*) As part of the reorganization, several teams—including Employee Relations and the Employee Service Center—were consolidated into a single Employment Team. (*Id.*) Nachtrieb chose the Employee Service Center's manager, John Bartley ("Bartley"), to be the manager of the consolidated Employment Team. (*Id.* at 3–4.) During the reorganization, Flowers told Nachtrieb that he was interested in becoming an "Employee Relations Manager" within the consolidated department. (*Id.*; Dkt. No. 39 at 2.) Nachtrieb informed Flowers that Bartley had been given the Employment Manager position, and that the new team would not include a separate Employee Relations Manager. (Dkt. No. 56 at 3–4.)

Following the reorganization, Bartley was in line to be Flowers' direct supervisor. (Dkt. Nos. 55 at 2–3; 56 at 4.) Bartley was aware of Flowers' reported performance deficiencies and told Nachtrieb that if these issues continued, he would "performance manage" Flowers, which could result in his termination. (Dkt. No. 55 at 3.) Nachtrieb decided to directly supervise Flowers because he did not want him to be terminated. (Dkt. No. 56 at 4.) Nachtrieb hoped that he could mentor Flowers out of his Employee Relations role and into another opportunity either in another department at Fred Hutch or with a different employer. (*Id.*)

---

[1] Nachtrieb states that Williams recommended to him that Flowers be terminated for unsatisfactory performance in mid-2010. (Dkt. No. 56 at 2.)

In August 2012, Nachtrieb and Flowers completed a "Combined Performance Appraisal and Professional Development Plan." (*Id.* at 14–21.) The document both assessed Flowers' performance during the prior year and outlined opportunities for professional development over the coming year. (*Id.*) Nachtrieb's assessment of Flowers' performance was generally positive. (*Id.*) Flowers had never previously received a written performance evaluation during the decade he was supervised by Williams. (Dkt. No. 66 at 2.) Under the heading "Suggestions for Improvement," Nachtrieb wrote: "Jon and I have discussed the development of his leadership abilities and his exploration of roles and career possibilities as a way of creating [sic] for his desired growth into leadership and management." (Dkt. No. 56 at 19.) Nachtrieb later characterized this document as a "go to grow" plan.[2] (*Id.* at 4.)

In October 2012, Nachtrieb and Flowers began having weekly one-on-one meetings. (*Id.* at 5.) Nachtrieb states that the meetings were instituted to "assist Mr. Flowers transition to a position for future success, and to meet his career goals." (*Id.*) Flowers states that the meetings started after he complained to Nachtrieb about experiencing a hostile work environment created by various colleagues. (Dkt. No. 66 at 2.) It is undisputed that during their meetings, Nachtrieb and Flowers discussed his professional development, as well as Flowers' concerns about co-workers treating him with disrespect and hostility. (Dkt. Nos. 56 at 5–6; 66 at 2.)

In early 2013, Flowers took part in various professional development opportunities, such as attending a conference to learn more about Fred Hutch's Organizational Development Team. (Dkt. No. 56 at 5–6.) These opportunities were intended to expose Flowers to different job opportunities at Fred Hutch; however, according to Nachtrieb and others, Flowers showed little interest in these other work areas. (*Id.*; Dkt. No. 57 at 3.) Throughout 2013, Flowers remained in his job as an Employee Relations Supervisor and continued to express to Nachtrieb that he wanted to be promoted to the role of Employee Relations Manager. (Dkt. No. 56 at 6.) Because

---

[2] The term "go to grow" is not used in any of the employment documents that deal with Flowers' time at Fred Hutch.

that role did not exist, and because Flowers appeared unhappy with his current position, Nachtrieb decided it was time to separate Flowers from Fred Hutch. (*Id*. at 7.) In July 2013, Nachtrieb and Bartley state that they decided to tell Flowers that he must find a new job by October 1, 2013. (Dkt. Nos. 55 at 6, 56 at 7.)

Before Nachtrieb acted on this plan, Flowers complained that he thought he was experiencing racial discrimination at Fred Hutch. (*Id*. at 29–30.) In an email to Nachtrieb sent on July 23, 2013, Flowers expressed frustration about not being considered to manage the Employee Relations Team and that "without any other logical explanation for this treatment, I can only conclude that it is because of my race." (*Id*. at 29.) Flowers further stated that he would be making a formal complaint with an independent agency. (*Id*. at 30.) On September 26, 2013, Flowers filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). (Dkt. No. 53-1 at 84.)

In September 2013, Fred Hutch hired a third-party, Janice Clusserath ("Clusserath"), to investigate Flowers' Equal Employment Opportunity ("EEO") complaint. (Dkt. No. 58 at 2.) As part of her investigation, Clusserath interviewed several current and former employees in the HR Department, including Flowers, Nachtrieb, Bartley, and Williams. (Dkt. No. 56 at 36.) On November 5, 2013, Clusserath provided Fred Hutch with her written findings, in which she concluded that Flowers' discrimination claims were unfounded. (*Id*. at 45–46.) Clusserath's report also detailed some of Flowers' supposed work performance issues. (*Id*. at 39–40.)

After receiving Clusserath's report, Nachtrieb decided to revert back to his plan to separate Flowers by a date certain. (*Id*. at 9.) On November 14, 2013, Nachtrieb and Fred Hutch's Chief Operating Officer ("COO") Myra Tanita ("Tanita") met with Flowers, provided him the findings of Clusserath's report, and informed him that he would be separated. (*Id*.) Flowers was officially separated on November 17, 2013. (*Id*. at 10.) Flowers responded by filing a second EEO complaint for retaliation. (Dkt. No. 53-1 at 88.)

Flowers brought this lawsuit charging Fred Hutch with disparate treatment and retaliation

under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e-2(a), 2000e-3, as well as violation of The Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f). The Court granted Fred Hutch's motion for judgment on the pleadings regarding Flowers' OWBPA claim and motion for partial summary judgment on Flowers' disparate treatment claim. (*See* Dkt. Nos. 22, 44.) Fred Hutch now moves for summary judgment on Flowers' remaining claim of retaliation in violation of Title VII.[3]

## II. DISCUSSION

### A. Flowers' Motion to Compel

Flowers asks the Court to compel Fred Hutch to perform a second Federal Rule of Civil Procedure 30(b)(6) deposition because Fred Hutch's designated corporate representative, Nachtrieb, was unable to answer questions regarding two subtopics during the first deposition. (Dkt. No. 60 at 1.) Fred Hutch objects to the motion to compel arguing, among other things, that Nachtrieb provided adequate answers at the deposition. (Dkt. No. 62 at 1.)

Pursuant to Federal Rule of Civil Procedure 30(b)(6):

> [A] party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination. The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify . . . . The persons so designated shall testify as to the matters known or reasonably available to the organization.

Fed. R. Civ. P. 30(b)(6). As one court has noted, a corporation has "a duty to make a conscientious, good-faith effort to designate knowledgeable persons for Rule 30(b)(6)

---

[3] After Fred Hutch filed its reply brief, Flowers filed a notice of supplemental authority with two accompanying declarations. (*See* Dkt. Nos. 70–72.) These filings are improper. A notice of supplemental authority is only allowed to "bring to the court's attention relevant authority issued after the date the party's last brief was filed." W.D. Wash. Local Civ. R. 7(n). None of the case law contained in Flowers' notice meets this criteria. (*See* Dkt. No. 70.) Moreover, there was no basis in the Local or Federal Rules for Flowers to file the accompanying declarations, which respond to issues raised in Fred Hutch's motion for summary judgment. (Dkt. Nos. 71, 72.) Therefore, the Court STRIKES Flowers' notice of supplementary authority and accompanying declarations (Dkt. Nos. 70–72) and disregards them on summary judgment.

depositions and to prepare them to fully and unevasively answer questions about the designated subject matter." *Starlight International, Inc. v. Herlihy*, 186 F.R.D. 626, 638 (D. Kan. 1999).

Flowers asserts that Fred Hutch did not sufficiently prepare Nachtrieb for his deposition because he was unable to answer questions regarding (1) why Fred Hutch selected Clusserath to perform the investigation into Flowers' discrimination complaint and (2) what Fred Hutch communicated to Clusserath about the investigation, including the purpose, scope, and goals of the investigation. (Dkt. Nos. 60 at 6, 64 at 9.)

Nachtrieb provided adequate answers to questions regarding why Fred Hutch selected Clusserath to perform the investigation. Nachtrieb testified that Fred Hutch hired Clusserath after Flowers made his complaint and declined to participate in a mediation. (Dkt. No. 64 at 19.) Nachtrieb testified that Tanita made the ultimate decision to select Clusserath and was not sure if other investigators were proposed. (*Id*. at 20.) Nachtrieb stated that he recommended Clusserath because she had been an "HR professional, previously been at Nordstroms, which was well thought of from an HR standpoint as well, had done other investigations, was well thought of in the HR community." (*Id*. at 21.) Although, Nachtrieb was not sure if Clusserath was asked for her resume, he responded that it was Fred Hutch's practice to conduct such due diligence. (*Id*. at 22.) Flowers has not demonstrated with specificity how Nachtrieb's answers to questions regarding why Fred Hutch selected Clusserath were inadequate.

Flowers has demonstrated, however, that Nachtrieb did not provide adequate answers to questions regarding what Fred Hutch communicated to Clusserath about the investigation. The following exchange took place during the Rule 30(b)(6) deposition:

> **Counsel:** And so what did the Center communicate to Ms. Clusserath was the objective of the investigation?
>
> **Nachtrieb:** So because I was not involved, I can't tell you with full clarity what that was, but I can tell you what the typical behavior would have been and I'm sure occurred.
>
> **Counsel:** Okay. But that's speaking generally and not in this specific instance?

> **Nachtrieb:** Yes.
>
> **Counsel:** So you don't know specifically what it was that was communicated to the investigator about the purpose of the investigation?
>
> **Nachtrieb:** No. But I can tell you that that is how we handle those things and having worked for Myra for many years, I'm quite sure that that's what would have been done.

(Dkt. No. 64 at 22–23.) Nachtrieb was not able to answer questions regarding what Fred Hutch communicated to Clusserath about the investigation and suggested that Tanita would have been able to answer. In other words, had Nachtrieb consulted with Tanita prior to the Rule 30(b)(6) deposition, he likely would have been able to provide an answer to these questions. Fred Hutch suggests that it did not have a duty to produce Tanita for the deposition or have Nachtreib consult with her because she is no longer employed with Fred Hutch. (Dkt. No. 62 at 4.) However, a corporation is not relieved "of the duty to prepare a properly educated Rule 30(b)(6) designee," just because it no longer employs a person with relevant knowledge. *Great Am. Ins. Co. of N.Y. v. Vegas Const. Co.*, 251 F.R.D. 534, 541 (D. Nev. 2008).

Because Fred Hutch failed to adequately prepare Nachtrieb to answer questions about Fred Hutch's communications with Clusserath regarding the purpose, scope, and goals of the investigation, the Court will consider Nachtrieb's answers to those questions as binding on Fred Hutch at summary judgment—in other words, that Fred Hutch does not know what it communicated to Clusserath about the purpose, scope, and goals of the investigation. Additionally, at trial Fred Hutch will be precluded from having Nachtrieb or any other organizational representative provide testimony regarding Fred Hutch's communications with Clusserath regarding the scope, purpose, or goals of the investigation.[4] The exclusion of evidence is an appropriate sanction, given the nature of the violation. *See* Fed. R. Civ. P. 37(b)(2)(ii) (allowing district courts to "prohibit[] the disobedient party from supporting or

---

[4] The Court's order does not preclude Clusserath from testifying about her communications with Fred Hutch regarding the purpose, scope, and goals of the investigation.

opposing designated claims or defenses, or from introducing designated matters in evidence.").

The Court denies Flowers' request for a second Rule 30(b)(6) deposition and for an award of costs and expenses. Ordering a second Rule 30(b)(6) deposition would be a misuse of resources because Flowers would only need to ask Fred Hutch's designated representative a few questions. The exclusion of evidence is a more narrowly tailored remedy. Moreover, the Court does not believe that Nachtrieb was so ill-prepared that an award of expenses or other monetary sanctions is appropriate. Flowers provided Fred Hutch with over 30 topics and subtopics in preparation for its Rule 30(b)(6) deposition, but has only identified one subtopic that Nachtrieb was actually unprepared to answer. Given this, and that the Court has only partially granted Flowers' motion to compel, the Court DENIES Flowers' request for an award of expenses. *See* Fed. R. Civ. P. 37(a)(5)(C) (where discovery motion is granted in part and denied in part the district court *may* apportion the reasonable costs for the motion).

Flowers' motion to compel is GRANTED in part and DENIED in part. At trial, Fred Hutch will be precluded from having Nachtrieb or any other organizational representative provide testimony regarding Fred Hutch's communications with Clusserath regarding the scope, purpose, or goals of the investigation.

### B. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such a determination, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence

for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49. Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### C. Flowers' Retaliation Claim

Title VII prohibits retaliation against an employee engaging in an activity protected by the statute, such as filing an EEO complaint. 42 U.S.C. § 2000e-3(a); *see Poland v. Chertoff*, 494 F.3d 1174, 1180 (9th Cir. 2007). District courts use a three-step burden-shifting framework to determine whether a Title VII retaliation claim should survive summary judgment. *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1105 (9th Cir. 2008). Under this framework, the plaintiff must first establish a *prima facie* case of retaliation, which requires proof that: (1) the plaintiff engaged in a protected activity; (2) suffered an adverse employment action; and (3) a causal connection between the two. *Bergene v. Salt River Project Agric. Improvement and Power Dist.*, 272 F.3d 1136, 1140–41 (9th Cir. 2001). If the plaintiff establishes a *prima facie* case, "the burden shifts to the defendant to set forth a legitimate, non-retaliatory reason for its actions." *Id*. The plaintiff must then produce evidence to show that the stated reasons were a pretext for retaliation. *Id*.

#### 1. *Prima Facie* Case of Retaliation

At the summary judgment stage, the degree of proof necessary to establish a *prima facie* case for a Title VII retaliation claim "is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). It is undisputed that Flowers has established the first two elements of his *prima facie* case: he engaged in a protected activity when he filed a discrimination complaint with the EEOC, and suffered an adverse employment action when he was subsequently separated by Fred Hutch. (Dkt. Nos. 64 at 2–4, 67 at 44); (*see* Dkt. No. 52 at 16) ("Fred Hutch does not dispute that Flowers can establish the first and second elements of his [retaliation] claim."). Therefore, the

Court need only determine whether Flowers has made a *prima facie* showing of a causal link between his decision to file an EEO complaint and his subsequent termination.

To show the necessary causal link, an employee must demonstrate that taking part in the protected activity was the "but-for cause" of the employer's adverse action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). This requires showing that the unlawful retaliation would not have occurred absent the plaintiff engaging in a protected activity. *Stilwell v. City of Williams*, 831 F.3d 1234, 1246–47 (9th Cir 2016) (citing *Nassar*, 570 U.S. at 362). A plaintiff may establish causation with "circumstantial evidence, such as the employer's knowledge that [he or she] engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). In *Yartzoff*, the Ninth Circuit held that a plaintiff made a *prima facie* showing of causation where his employer took adverse actions less than three months after the plaintiff filed an administrative complaint, two weeks after the charge was first investigated, and less than two months after the investigation ended. *Id.*

Here, there is sufficient temporal proximity between Flowers' discrimination complaint and his separation from Fred Hutch to support a *prima facie* showing of causation. Flowers first told Nachtrieb that he was going to file a discrimination complaint with an outside agency in an email sent on July 23, 2013. (Dkt. No. 56 at 29–30) (Flowers: "I am uncomfortable with continuing to feel this way and would like to put this to rest by having an independent agency hear and potentially investigate the concerns that I have expressed over the years."). Flowers eventually filed his EEO complaint on September 26, 2013. (Dkt. No. 53-1 at 84.)

Fred Hutch responded to Flowers' complaint by hiring Clusserath to conduct an investigation into his claims. (Dkt. No. 67 at 40–42.) Clusserath conducted her investigation from September 27, 2013 to October 18, 2013. (Dkt. No. 56 at 36.) On November 5, 2018, Clusserath published the findings of her investigation, which she sent to Tanita. (*Id.* at 35.) On November 14, 2018, Tanita and Nachtrieb met with Flowers, provided him a copy of

Clusserath's report, and informed him that he would be separated from Fred Hutch.[5] Flowers was officially separated on November 17, 2018. (*Id*. at 10.)

Based on this timeline, Fred Hutch terminated Flowers less than four months after he first indicated he would file a discrimination complaint, less than two months after he filed his EEO Complaint and Clusserath began her investigation, and less than two weeks after Fred Hutch received the results of the investigation. The Court finds it notable that Fred Hutch informed Flowers he would be separated on the same day it provided him with the results of the investigation—an investigation that was ostensibly undertaken because Flowers had complained about discrimination in the workplace. Viewing the timing of events in the light most favorable to Flowers, a reasonable trier of fact could conclude that Flowers' complaint—which caused Fred Hutch to launch its investigation—precipitated his termination. *See Coszalter v. City of Salem*, 320 F.3d 968, 977–78 (9th Cir. 2003) ("[d]epending on the circumstances, three to eight months is easily within a time range that can support an inference of retaliation.")

Fred Hutch argues that Flowers cannot establish but-for causation because Nachtrieb had already decided to separate Flowers prior to the filing of his EEO complaint. (Dkt. No. 56 at 7.) If the undisputed evidence demonstrated that Fred Hutch was planning to terminate Flowers prior to his complaint, the Court agrees that Flowers could not establish but-for causation. *See Knight v. Brown*, 797 F. Supp. 2d 1107, 1135 (W.D. Wash. 2011), *aff'd*, 485 F. App'x 183 (9th Cir. 2012) (finding that temporal proximity alone is insufficient to infer retaliation where employer had already proposed terminating plaintiff prior to his discrimination complaint); *see also Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their

---

[5] At the meeting, Fred Hutch offered Flowers two options for leaving the company. He could either remain on payroll until early 2014 to look for another job, or resign immediately with a three months' severance. (Dkt. No. 56 at 9–10.) Both options required Flowers to release any claims against Fred Hutch. (*Id*.) Fred Hutch quibbles about whether its conduct amounted to a "termination" of Flowers; however, in its deposition, Fred Hutch admitted that it "separated [Flowers'] employment," and that Flowers did not consent to the separation. (Dkt. No. 67 at 44.)

proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). The Court must decide, then, whether there is a genuine dispute of material fact regarding whether Fred Hutch had decided to terminate Flowers prior to his EEO complaint.

In a declaration in support of summary judgment, Nachtrieb states that "in mid-July 2013 we decided on a plan to expressly inform Mr. Flowers that he needed to find another job, and to do so by October 1, 2013." (Dkt. No. 56 at 7.) Bartley similarly states that he and Nachtrieb decided in early July 2013 that Flowers had to find employment elsewhere. (Dkt. No. 55 at 6.) During their July 23, 2013 meeting, Nachtrieb says that he "expressly told Mr. Flowers that he needed to find a job outside the organization." (*Id*.) Nachtrieb further states that he had planned to tell Flowers during the meeting that he would be separated from Fred Hutch by a date certain, but that "our conversation became a bit sidetracked," and "I did not communicate the October 1 deadline to Mr. Flowers." (*Id*.)[6] Fred Hutch also points to an email exchange between Nachtrieb and Flowers, following their July 23 meeting, in which Flowers wrote "[a]lthough I appreciate your offer to help me find employment as an ER Manager elsewhere, I have not expressed an interest in doing so." (*Id*. at 28.)

In response, Flowers offers sufficient evidence to create a genuine dispute of material fact regarding whether Fred Hutch intended to terminate him prior to his discrimination complaint. In a declaration in opposition to summary judgment, Flowers states that he and Nachtrieb "never discussed employment opportunities outside [Fred Hutch] during our weekly meetings, and Mr. Nachtrieb never presented this as something I was required to pursue." (Dkt. No. 66 at 2.) As for the email exchange, Flowers' comment that he appreciated Nachtrieb's offer to help him find employment elsewhere was made in response to an email from Nachtrieb that stated "I believe

---

[6] Fred Hutch points to notes Nachtrieb purportedly created from the July 23, 2013 meeting with Flowers, which state that Nachtrieb informed Flowers that he needed to seek employment elsewhere. (Dkt. No. 56 at 32–33.) The Court disregards these notes because they are hearsay, and Fred Hutch has not provided any exception that would make them admissible.

you are qualified for an ER manager role somewhere. I would like to help you find one, because I believe you deserve one. There simply isn't a position here." (Dkt. No. 56 at 29.) Moreover, Nachtrieb's email was in response to Flowers' email that stated he would be filing a formal discrimination complaint. (*Id*.) Viewed in the light most favorable to Flowers, this evidence suggests Nachtrieb did not tell Flowers that he needed to find another job prior to his EEO complaint.

### 2. Fred Hutch's Non-Retaliatory Reason

After the plaintiff establishes a *prima facie* case of retaliation, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory explanation for the adverse employment action. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). Fred Hutch has articulated a legitimate, non-retaliatory explanation for its decision to separate Flowers. Nachtrieb asserts that Fred Hutch separated Flowers because he was unhappy with his role as an Employee Relations Supervisor and wanted a position—Employee Relations Manager—that did not exist in the HR Department. (Dkt. No. 56 at 6.) Nachtrieb and Bartley further state that the "go to grow" plan was unsuccessful and "did not result in Mr. Flowers seeking and finding employment elsewhere." (Dkt. Nos. 55 at 6, 56 at 6.) Nachtrieb states that his efforts to mentor Flowers into another role in the organization were unsuccessful, and thus Flowers "needed to find another job." (*Id*. at 7.) According to Nachtrieb, he had decided to separate Flowers in July 2013, but put the plan on hold once Flowers made his EEO complaint. (*Id*.) Once Clusserath completed her investigation, and determined that Flowers' discrimination claims were unfounded, Nachtrieb decided to return to the previously adopted plan of "setting a timeline for the separation of Flowers." (*Id*. at 9.)

Based on the foregoing, Fred Hutch has met its burden of production to produce a non-retaliatory reason for its decision to separate Flowers.

### 3. Flowers' Evidence of Pretext

Once an employer provides a non-retaliatory reason for its adverse employment action,

the plaintiff must put forth evidence that suggests the proffered reason was pretextual. *Manatt v. Bank of Am.*, 339 F.3d 792, 801 (9th Cir. 2003). A plaintiff can demonstrate pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005). If a plaintiff uses circumstantial evidence to satisfy this burden, such evidence "must be specific" and "substantial." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221–22 (9th Cir. 1998).

Flowers has provided specific and substantial circumstantial evidence that, when viewed in the light most favorable to him, would allow a reasonable trier of fact to conclude that Fred Hutch's reason for terminating him was pretextual.

Flowers asserts that Fred Hutch has offered shifting rationales for why he was separated. (Dkt. No. 65 at 17–18.) During the EEOC investigation into Flowers' discrimination claim, Fred Hutch emphasized Flowers' performance issues in its decision to separate him. (*See* Dkt. No. 67 at 145–46.) As part of that investigation, Nachtrieb also stated that his intent behind the efforts to provide Flowers with professional development opportunities in 2013 were made "with the understanding that there simply was not a future for Mr. Flowers at the Center." (*Id*. at 146.)

Conversely, Fred Hutch has articulated different reasons for why Flowers was separated during the litigation of this case. In an answer to an interrogatory regarding the information relied upon to terminate Flowers, Fred Hutch stated that Flowers was separated because he "sought to obtain an Employee Relations Manager position at the Center that did not exist." (Dkt. No. 67 at 61.) In his declaration, Nachtrieb suggests that Flowers was separated because he was unhappy in his role of Employee Relations Supervisor and wanted a management position that did not exist. (Dkt. No. 56 at 6.) In its motion for summary judgment, Fred Hutch states that it decided to part ways with Flowers "so that he could find another opportunity consistent with his skills and desire for a management position." In its Rule 30(b)(6) deposition, Fred Hutch

stated that Flowers' "performance and his unhappiness were factors in the decision to end his employment." (Dkt. No. 67 at 46–47.)

The Court can infer pretext when an employer provides different and inconsistent reasons for taking an adverse employment action. *See Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 661 (9th Cir. 2002). A reasonable trier of fact could draw an inference that Fred Hutch's stated reasons for terminating Flowers—his poor performance, his unhappiness with his position, his failure to expand into another role, and his desire for a management position—are not necessarily consistent with one another.

That is especially true because there appears to be a genuine dispute of fact regarding Flowers' work performance. Although Williams, Bartley, and Nachtrieb have provided declarations outlining Flowers' unsatisfactory work performance, his 2012 written Performance Appraisal paints a different picture. In what is the only written evaluation either party has provided as evidence, Nachtrieb agreed with Flowers' own positive assessment of his performance, writing:

> I have received considerable good feedback about Jon's handling of issues and projects. Of particular remark is the layoff of a number of staff in Animal Health. It was well orchestrated, and done in a respectful, open manner – and in a way that despite the inherent negative act, set a good tone for the staff and at the Center. The new Vet / manager is super appreciative of Jon's partnership and assistance. On a number of occasions, Leslie Sandberg, speaking for VIDD, has voiced appreciation to me for Jon's work on multiple issues. Jon has a great way with people that is disarming, genuine, respectful, and in the moment. Much appreciate him as a colleague.

(Dkt. No. 56 at 17.) The written evaluation does not include any feedback that appears to reflect negatively on Flowers' performance. (*Id*. at 14–21.) While Nachtrieb states that he "drafted Mr. Flowers' performance appraisal so that it would not be an impediment for Mr. Flowers achieving employment elsewhere," his written appraisal is at odds with his later negative assessment of Flowers' performance and with his suggestion that Flowers had no future at Fred Hutch. (*See* Dkt. Nos. 56 at 4–5, 67 at 146.) Reports of Flowers' poor performance are also inconsistent with

the fact that he received merit-based pay increases each year he worked at Fred Hutch. (Dkt. No. 67 at 68–77.)

Flowers also points to circumstantial evidence that Fred Hutch used the investigation into his discrimination claims to highlight performance issues in order to provide a basis for his termination. (Dkt. No. 65 at 13–16.) While Clusserath's written report makes specific findings about each of Flowers' discrimination claims, it also contains significant detail about his supposed work performance issues. (Dkt. 56 at 39–40.) In response to an interrogatory asking about Flowers' performance in relation to applicable performance standards, Fred Hutch stated "Plaintiff's performance at the Center, as relevant to this litigation, is described in pages 5–6 of the report by Ms. Janice Clusserath." (Dkt. No. 67 at 62.)

As the Court has already noted regarding Flowers' motion to compel, Fred Hutch was unable to answer questions at its deposition about what it told Clusserath the purpose, scope, and goals of her investigation were. *See supra* Part II.A. Moreover, Nachtrieb suggested that Clusserath's investigation could help to show Flowers that he would need to seek employment elsewhere. (*See* Dkt. No. 56 at 7) ("Given that the last nine months had not successfully moved the discussion forward, I welcomed a third party to investigate the issues Mr. Flowers had raised as it could help communicate to Mr. Flowers our efforts to further his career at Fred Hutch or somewhere else.")

When considering the above evidence, a reasonable trier of fact could conclude that Fred Hutch's stated reason for separating Flowers was a pretext for retaliation. That is particularly true in light of the temporal proximity between Flowers' discrimination complaint and his separation from Fred Hutch. *See supra* Part II.C.1. At the very least, there are genuine disputes of material fact, as described above, that preclude summary judgment. Therefore, Fred Hutch's motion for summary judgment (Dkt. No. 52) is DENIED.

**D. Punitive Damages**

Fred Hutch additionally asks the Court to preclude Flowers from seeking punitive

damages at trial. As a general matter, plaintiffs may recover punitive damages as part of a Title VII retaliation claim if they can demonstrate that the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to [plaintiff's] federally protected rights." 42 U.S.C. § 1981a. However, the United States Supreme Court has limited the circumstances in which an employer can be held vicariously liable for punitive damages based on the discriminatory actions of its employees. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 545 (1999). In *Kolstad*, the Court held that "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." *Id.* (citation and internal quotation marks omitted). The limitation does not apply "when the corporate officers who engage in illegal conduct are sufficiently senior to be considered proxies for the company." *Passantino v. Johnson & Johnson Consumer Prod., Inc.*, 212 F.3d 493, 517 (9th Cir. 2000).

Fred Hutch asserts that it took good faith efforts to comply with Title VII and that the employees who separated Flowers—Nachtrieb and Tanita—were not sufficiently senior as to be considered proxies for the company. (Dkt. No. 69 at 9–10.) The Court concludes that there are remaining factual issues that must be resolved before it can rule on the issue of punitive damages. For example, it is not entirely clear where Nachtrieb and Tanita fit within Fred Hutch's organizational hierarchy. Nor is it totally clear what role Tanita played in separating Flowers. Based on the current record, Fred Hutch has not met its burden to demonstrate that Flowers is precluded from seeking punitive damages at trial. Therefore, Fred Hutch's motion is DENIED without prejudice, and the Court will reconsider this issue at trial.

### III. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. No. 52) is DENIED. Plaintiff's motion to compel (Dkt. No. 60) is GRANTED in part and DENIED in part.

//

1       DATED this 16th day of November 2018.

John C. Coughenour
UNITED STATES DISTRICT JUDGE